USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/28/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

SAYED NOORALISHAH SHENGHUR,          :

                 Movant,          :

   - against -          :

UNITED STATES OF AMERICA,          :

             Respondent.          :

-----------------------------------------------------------x

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
JED S. RAKOFF**

10cr50-JSR
12cv9314-JSR-FM

**FRANK MAAS**, United States Magistrate Judge.

I.    Introduction

       Petitioner Sayed Nooralishah Shenghur ("Shenghur") moves pursuant to 28

U.S.C. § 2255 ("Section 2255") to vacate his conviction, following a jury trial, on a

charge of conspiring to distribute one kilogram or more of heroin, in violation of 21

U.S.C. §§ 841(b)(1)(A) and 846.  (See Cr. ECF No. 16).[1]

       In his motion (Civ. ECF No. 38 ("Pet.")), Shenghur contends that various

errors on the part of his trial counsel, Lawrence K. Feitell, Esq. ("Feitell"), deprived him

---

[1]    "Cr. ECF No." refers to docket entries in Shenghur's criminal case, 10cr50.  "Civ.
ECF No." refers to docket entries in 12civ9314, the related civil proceeding.  "H." refers to the
transcript of the pretrial competency hearing.  (Cr. ECF No. 23).  "T." refers to the trial
transcript.  (Cr. ECF No. 26).  "S." refers to the transcript of Shenghur's sentencing.  (Cr. ECF
No. 34).  "Shenghur Aff." refers to the Affidavit of Sayed Nooralishah Shenghur, dated October
15, 2012, annexed to his petition.  (Civ. ECF No. 38).

of his Sixth Amendment right to effective assistance of counsel.[2]  Specifically, Shenghur asserts that Feitell (a) was hostile, (b) prevented him from testifying during his pretrial competency hearing and at trial, (c) made statements to the jury that effectively diminished the Government's burden of proof, and (d) was ineffective during his cross-examination of prosecution witnesses.  (Pet. at 16-22).

For the reasons that follow, I recommend that Shenghur's motion be denied.  Additionally, because Shenghur has failed to make the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not issue.

## II.   Factual Background

### A.   Trial

#### 1.   Government's Case

The Government's proof at trial would have permitted a reasonable juror to find as follows:

In September and October of 2009, Abdul Nasraty ("Nasraty"), a confidential Drug Enforcement Agency ("DEA") source, recorded a series of telephone conversations with Abdul Khaliq ("Khaliq"), a narcotics broker in Pakistan.  During the course of their discussions, Khaliq told Nasraty that an individual from California known as Agha Jan would contact Nasraty "for the purposes of [confirming a] heroin deal."  (T. 147, 151, 239-43, 254).  Khaliq instructed Nasraty to use the name "Abdullah" when

---

[2]      Feitell's son Bennett also assisted in Shenghur's defense.  (See H. 2; T. 2).

speaking with Agha Jan, and to obtain a heroin sample before completing the deal.  (Id. at 243-44, 247).  During a subsequent telephone call on October 15, 2009, Agha Jan agreed to travel to New York to deliver the heroin to Nasraty.  (Id. at 263-64).

On October 30, 2009, posing as Agha Jan, Shenghur met with Nasraty at a Starbucks coffee shop ("Starbucks") in Manhattan.  (Id. at 134, 157, 273-74, 286-87).  Shenghur arrived at the Starbucks with his son, Abdul Kakar.  (Id. at 215, 287).  During the ensuing meeting, Shenghur gave Nasraty a heroin sample concealed in a paper napkin, stating that if Nasraty found the quality acceptable, he could purchase two and one-half kilos of heroin for $160,000.  Shenghur also boasted that he could procure as much as one ton of heroin from Afghanistan.  (Id. at 164, 287-92, 300, 304).  DEA Group Supervisor Patrick Hamlette ("Hamlette") surveilled the meeting, which also was captured on videotape and recorded by Nasraty using a concealed audio recording device.  (Id. at 84, 88, 157, 159-60, 213-16, 285).  The heroin sample, which Nasraty subsequently turned over to the DEA, was wrapped in a napkin from the Hotel Faran Karachi.  (Id. at 163-64).

After leaving the Starbucks, Shenghur and his son hailed a taxi.  The DEA followed the cab and subjected it to a pretextual stop in South Ozone Park, Queens.  (Id. at 101-02, 104).  During the stop, Rafael Dilone ("Dilone"), a police detective assigned to assist the DEA, posed as a taxi safety inspector.  When Dilone requested the occupants' identification documents, Shenghur appeared nervous, fidgety, and uncooperative, but provided Dilone with his passport, his airplane boarding pass, and a temporary California

driver's license.  (Id. at 102-03, 127, 349-53, 355).  Dilone and his colleagues then tailed the taxi to an EconoLodge hotel located at 114th Street and Rockaway Boulevard in Queens, where they determined Shenghur's room number with the assistance of a hotel employee.  (Id. at 104-05, 129, 356).

After responding to a knock on his hotel room door, Shenghur gave Hamlette and Dilone permission to enter.  (Id. at 106, 131, 212, 357-58).  Once inside, Hamlette noticed a "strong acidic odor" characteristic of heroin, and an open suitcase on the floor containing dresses wrapped in clear plastic.  (Id. at 106, 112, 358).  The luggage tag on the suitcase bore Shenghur's name.  (Id. at 113, 115).  Shenghur initially denied that any drugs or money were in the room, but, after being advised of his Miranda rights, stated that "the heroin was his" and was for "personal consumption."  (Id. at 121, 361).  Pursuant to a consent search, the DEA then found 1.4 kilograms of heroin concealed in the hems of the dresses in Shenghur's suitcase, and another small quantity of heroin wrapped in a napkin bearing the logo of the Hotel Faran Karachi in a pocket of the suitcase.  (Id. at 122, 125-26, 363, 367, 410).

2.    Defense Case

The defense did not call any trial witnesses.  (See id. at 428).

B.    Verdict and Sentencing

On August 5, 2010, after a four-day trial, the jury convicted Shenghur on the sole count of the indictment, finding that he had agreed to distribute one kilogram or more of heroin.  (T. 537-39).  On December 3, 2010, Your Honor sentenced Shenghur to

the mandatory minimum prison term of 120 months, to be followed by five years of supervised release. (S. 5, 14).

When he was afforded an opportunity to address the Court before sentence was imposed, Shenghur challenged the trial proceedings and his defense counsel's tactics, maintaining that "there were many mistakes in [his] case." (Id. at 10). Among other things, Shenghur contended that an interpreter had mistranslated his statements. (Id. at 10-11). He also complained that his "rights were not properly given to [him]," that he "was not given a chance to speak in court," that his attorneys instructed him "more than 10 times" not to speak, and that had he testified, he would have been "let go the same day." (Id. at 9-12). Finally, Shenghur asserted that he was illiterate, "nervous and . . . physically ill," and that his attorneys failed to present to the jury his lifetime of suffering. (Id. at 11-12).

Notwithstanding Shenghur's asssertions to the contrary, Your Honor found that it was his decision not to testify at trial, stating that

> the record is clear and unequivocal, that the Defendant chose, after much hesitation, not to take the stand. He had every opportunity to do that. It was made clear to him, not only by counsel, but by the Court, that it was his decision. Counsel, of course, made a recommendation which counsel is obliged to make. But he chose not to take the stand. That was the time to say whatever he wanted on the issue of guilt or innocence.

(Id. at 8). Your Honor also praised Feitell's efforts to represent a "very difficult client" in a "very difficult situation." (Id. at 6).

C.     Pretrial Competency Hearing

Prior to trial, two psychologists, Drs. Cheryl Paradis and Marc Janoson,

examined Shenghur to determine whether he suffered from a mental disease or defect that

rendered him incompetent to stand trial.  (Civ. ECF Nos. 18, 19, 24).  Your Honor then

held a hearing over the course of five days in April and May 2010 to address that issue.

(See Civ. ECF No. 24).

1.     Government's Proof

Dr. Cheryl Paradis, a clinical psychologist specializing in forensic

psychology and neuropsychology, testified for the Government after meeting with

Shenghur twice for a total of four hours.  (H. 10-11, 42).

During their initial meeting, Dr. Paradis administered a simple test, asking

Shenghur to repeat three words:  "door, cat, pencil."  Shenghur instead repeated back the

words "bird, head, hat."  (Id. at 17-18, 370).   Similarly, when Dr. Paradis told Shenghur

the current date and later asked him to recall it, Shenghur claimed to be unable to do so.

(Id. at 41-42, 370).  Dr. Paradis concluded from these responses that Shenghur was

"motivated to exaggerate or feign cognitive impairment," particularly because Dr. Paradis

had heard Shenghur accurately repeat back an address during a recorded telephone

conversation with his son – a task of essentially the same difficulty as the ones  she had

asked him to perform.  (Id. at 17, 41, 45).

Given Shenghur's responses, Dr. Paradis administered the "Test of Memory

Malingering" ("TOMM"), a visual memory recognition test used to determine whether

6

someone is exaggerating or feigning memory impairment.  The TOMM protocol calls for the examinee to be shown images of fifty items at three-second intervals.  The person subsequently is shown fifty pairs of images, in which one image in each pair is from the original set of fifty.  The tester asks the examinee which images he has seen before.  (Id. at 36-37).  On the fourth administration of the test, Shenghur professed to recognize just sixteen images in the pairs, well below the score a patient typically would attain simply by guessing.  According to Dr. Paradis, Shenghur's score suggested that he was malingering.  (Id. at 37).

Dr. Paradis also reviewed Shenghur's medical records from a treating neurologist and interviewed his internist and psychologist, but found no evidence that Shenghur suffered from a cognitive impairment.  Dr. Paradis' review of recorded telephone calls that Shenghur had made from the Metropolitan Correctional Center ("MCC") similarly did not suggest that he was mentally retarded or suffered from dementia or brain damage.  (Id. at 44-45, 88-91, 101).[3]

Dr. Paradis also discussed Shenghur's criminal case with him, determining that he in fact understood the legal process.  As Dr. Paradis explained, Shenghur "underst[ood] part of the job of his attorney, [and] . . . the role of the jury."  (Id. at 96).

---

[3]       Significantly, after one such call was played, Your Honor remarked that it "reek[ed] of [Shenghur's] understanding of what his son is saying, what his situation is, what his strategy is, [and] how he has initially told a wrong story but then gave the right story," noting that the record also should reflect that Shenghur's "tone of voice, the manner in which he spoke, [and] all of the nuances that cannot be captured by the transcript all cut in favor of a finding of competency."  (H. 53).

Shenghur also appeared to understand the role of the Government and discussed potential defenses, his desire to go to a psychiatric hospital, his drug use, his state of mind, and the possibility of pleading guilty to a lesser charge.  (Id. at 97-98, 374-75, 389, 428-29; see also id. at 376 (Shenghur discussing his eligibility for a "safety valve" sentence reduction)).

Based on this evidence, Dr. Paradis concluded that Shenghur was fit to stand trial.

2.     Defense Proof

Dr. Marc Janoson, the defense psychologist, interviewed Shenghur and administered several competency tests.  (Id. at 63).

Dr. Janoson first administered the performance component of the Wechsler Adult Intelligence Scale ("WAIS").  (Id.).  According to Dr. Janoson, Shenghur scored "in the moderately mentally retarded range in four of the five nonverbal tests," with an overall IQ score of 51.  (Id. at 65, 129-30, 139).

Dr. Janoson next administered the Bender Gestalt and human figure drawings tests, finding the results of each to be similar.  (Id. at 63, 65, 254).  Dr. Janoson described Shenghur's performance on the Bender Gestalt test – a drawing exercise testing for brain dysfunction – as "absolutely defective," stating that it would typically warrant a referral to a neuropsychologist.  (Id. at 64, 66).  Indeed, Dr. Janoson testified that Shenghur likely suffered from brain damage because he had remarked that all the designs

he was asked to recreate "look[ed] the same to him" and took significantly longer than an average adult to accomplish the task.  (Id. at 147, 243-44).

Turning to the human figure drawings test, Dr. Janoson concluded that Shenghur's drawings were "defective," stating that they evidenced "virtually every known marker for brain damage," including separation of body parts, simplification, and uneven pencil pressure.  Dr. Janoson opined that it was "preposterous" to conclude that Shenghur had contrived to obtain these results, in part because the developmental levels of Shenghur's Gestalt figures and human figure drawings matched.  (Id. at 66, 206, 210-11, 251-52; see also id. at 70 ("[A]ny experienced interpreter looking at either the Bender or the human figure drawings would say they were produced by a defective human being. Whether it's precisely mental retardation or precisely organicity or the outside chance – as the prosecution would assert – malingering, that's the only question.")).

Dr. Janoson next administered a fitness assessment instrument ("FAI") designed to test an examinee's knowledge of the criminal justice process, which Shenghur also failed.  (Id. at 255-57).  Dr. Janoson found that Shenghur "exhibited an understanding of the charges" against him, but that he evidently also believed the CIA would intervene to "protect him."  (Id. at 255-56).  Contrary to Dr. Paradis' findings, Dr. Janoson concluded that Shenghur appeared not to understand the role of the Government, jury, or the defendant during a criminal trial, noting that he also had provided what Dr. Janoson considered ambiguous answers when asked about such concepts as witnesses, plea bargains, and the insanity defense.  (Id. at 256-57).  Curiously, despite these gaps in

9

his knowledge, Shenghur did understand the role of a cooperating witness.  (Id. at 336).

Dr. Janoson nonetheless concluded that Shenghur did not understand the federal criminal

justice system and had "clearly failed" the test.  (Id. at 259, 337).

Dr. Janoson also criticized Dr. Paradis's methodology because she had

administered the TOMM test without first testing Shenghur for mental retardation, an

impairment that allegedly frequently resulted in false-positive TOMM results.  (Id. at 62-

63).  Dr. Janoson further concluded that  Shenghur's score of 24 on the second TOMM

trial did not suggest malingering since various other test results indicated that Shenghur

suffered from a cognitive defect.  (Id. at 145).

Finally, Dr. Janoson had a different view of the recorded MCC telephone

conversations.  Disagreeing with Dr. Paradis, Dr. Janoson opined that one of the recorded

calls was, in fact, "irrational" because it was "farfetched" for Shenghur to think that he

could "beat a federal rap by concocting . . . and changing his story," and because he had

discussed his case "on the phone in a federal prison, where he knows or should know that

he is being recorded."  (Id. at 57-58; see also id. at 59 ("Anyone who discusses his case

on the phone at MCC is either retarded or demented or indiscrete or has a self destructive

urge.  I mean it's crazy.  Just on the face of it it's crazy.")).

Dr. Janoson maintained that "the whole picture" indicated that Shenghur

was not competent.  (See id. at 60, 74 ("[E]verything fits.  The IQ data fit, the Bender-

Gestalt intellectual level, the human figure drawing intellectual level fit.  The WAIS data

fit, the FAI data.  It's all of one piece, just like that crazy phone call he made to his son

10

where he was going to walk off away from a federal charge with a cockamamy story.")).

Dr. Janoson concluded that Shenghur was "defective on all four" tests he administered,

suffered from cognitive disorder NOS, opiate dependence, and major depressive disorder,

with possible mental retardation or dementia, and was not competent to stand trial.  (Id. at

120-21, 136, 189-91).

        3.     Competency Decision

In a "bottom line" order dated June 15, 2010, Your Honor determined that

Shenghur was competent to stand trial.  (Cr. ECF No. 24 ("Competency Order")).

Thereafter, Your Honor issued a decision, dated September 1, 2010, which described the

evidence of Shenghur's competency to stand trial as "overwhelming,"  (Cr. ECF No. 27

("Competency Dec.") at 2-4).  Indeed, Your Honor concluded that the recorded phone

calls from the MCC "fully corroborated Dr. Paradis's conclusions" and alone "established

[Shenghur's] competency beyond cavil."  (Id. at 9).  As the decision explained,

throughout the calls, Shenghur was "clear," and "lucid," engaged in "sophisticated

discussion of his case," "fully underst[ood] his rights," showed no difficulty

communicating, and evidenced no "cognitive impairment."  (Id.).

    D.     Subsequent Procedural History

        1.     Direct Appeal

With the assistance of newly-appointed counsel, Shenghur appealed his

conviction, alleging that he was not competent to stand trial and had received ineffective

assistance of counsel.  (Cr. ECF No. 32).  The Court of Appeals rejected these claims and

affirmed Shenghur's conviction in a summary order dated April 6, 2012.  United States

v. Shenghur, 466 F. App'x 61 (2d Cir. 2012).  In that order, the court first observed that,

"[i]n light of the opinion regarding Shenghur's competence provided by the government's

expert witness," it could not "conclude that the district court's determination that

Shenghur was competent to stand trial was clearly erroneous."  Id. at 61.  The court

further declined to address the merits of Shenghur's ineffective assistance of counsel

claim, explaining that it should first be raised in the district court.  Id. at 62 (citing

Massaro v. United States, 538 U.S. 500, 506 (2003)).

2.      Motion to Vacate Judgment

On September 30, 2012, Shenghur's appellate counsel moved to vacate his

judgment of conviction pursuant to 28 U.S.C. § 2255.  In that motion, Shenghur alleges

that Feitell provided ineffective assistance of counsel because he (a) was hostile, (b) did

not allow Shenghur to testify on his own behalf at the competency hearing or at trial, (c)

made statements to the jury that effectively diminished the Government's burden of

proof, and (d) ineffectively cross-examined the Government's trial witnesses.  (Pet. 16-

22).  Shenghur also has filed his own sworn supplement to that motion.  (Cr. ECF No. 44

("Supp. Pet.")).

III.    <u>Discussion</u>

    A.    <u>Standard of Review</u>

        The first sentence of Section 2255 provides that

> [a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255.  Relief under that statute consequently may be based only on "constitutional error . . . or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  <u>United States v. Bokun</u>, 73 F.3d 8, 12 (2d Cir. 1995) (quoting <u>Hill v. United States</u>, 368 U.S. 424, 428 (1962)).  Among the reasons for circumscribing relief in this manner are "a respect for the finality of criminal sentences, the efficient allocation of judicial resources, and an aversion to retrying issues years after the underlying events took place."  <u>Id.</u>

    B.    <u>Ineffective Assistance of Counsel</u>

        In order to prevail on an ineffective assistance of counsel claim, a petitioner must demonstrate that (1) his counsel's performance "fell below an objective standard of reasonableness" and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Strickland v. Washington</u>, 466 U.S. 668, 688-94 (1984).  Pursuant to <u>Strickland</u>, there is a "strong presumption that [a lawyer's] conduct falls within the wide range of reasonable

13

professional assistance." Id. at 689.  Therefore, the petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  As the Second Circuit has noted, "[t]he Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).

For a petitioner to prevail, his "application must contain assertions of fact that [he] is in a position to establish by competent evidence." United States v. Aiello, 814 F.2d 109, 113 (2d Cir. 1987).  "Airy generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing." Id. at 113-14.

It also is settled law that a court considering an ineffectiveness claim need not "address both components of the [Strickland] inquiry if the [petitioner] makes an insufficient showing on one." Strickland, 466 U.S. at 697.  As the Strickland court explained, "the object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id. Applying this reasoning, the Second Circuit has not hesitated to reject Section 2255 petitions based on ineffective assistance of counsel if a petitioner is unable to show any prejudice in light of the "overwhelming evidence of guilt adduced at trial." Strouse v. Leonardo, 928 F.2d 548, 556 (2d Cir. 1991); see, e.g., United States v. Simmons, 923

14

F.2d 934, 956 (2d Cir. 1991) ("[G]iven the plethora of evidence against him, there is little reason to believe that alternative counsel would have fared any better."); United States v. Reiter, 897 F.2d 639, 645 (2d Cir. 1990) ("[T]he trial judge correctly applied the two-part Strickland standard that required [petitioner] to prove prejudice, and he correctly concluded that in the face of the overwhelming evidence against him, [he] had not met that burden.").

Although Shenghur requests a hearing regarding his claims, "[i]t is within a district court's discretion to determine whether an evidentiary hearing is warranted." Bennett v. United States, No. 03 Civ. 1852 (SAS), 2004 WL 2711064, at *3 (S.D.N.Y. Nov. 23, 2004). Thus, a district court need not hold an evidentiary hearing before deciding a Section 2255 motion if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

In his Petition, Shenghur claims that his trial counsel provided constitutionally deficient representation in several ways. As set forth below, none of these assignments of error entitles him to a hearing or any other relief.

1.    Hostile Relationship Between Shenghur and Feitell

Shenghur first alleges that Feitell generally acted "antagonistic[ally]" toward him, and that this "dissension" caused such a "rift" that Shenghur "stopped trying to discuss the facts of [the] case with [Feitell]," thereby depriving him of effective assistance of counsel. (See Pet. at 16, 18-19; Shenghur Aff. ¶¶ 5-6; Supp. Pet. at 2).

15

Shenghur further asserts that had he been aware of his right to do so, he would have requested new counsel.  (Shenghur Aff. ¶ 8).

As support for this claim, Shenghur points to Dr. Paradis' perception of Shenghur and Feitell's relationship, gleaned during her interviews, which she summarized in her report and hearing testimony as follows:

> It appears that Mr. Shenghur has not been able to form a working relationship with Mr. Feitell.  This seems to be the result of Mr. Shenghur's high emotional state and his tension-filled relationship with his attorney.  I notice that when Mr. Feitell gave advice to his client Mr. Shenghur appeared increasingly frightened and closed off.
>
> . . . [Shenghur's] difficulty conferring with Mr. Feitell appears to be the result of conflicting personal styles.
>
> Mr. Shenghur may be able to work productively with a different defense attorney.  I recommend that he be afforded that opportunity. . . .

(H. 400-01).

The Social Security Death Index confirms that Feitell died in 2013.  (See https://familysearch.org/search/collection/1202535; see also http://www.legacy.com/obituaries/nytimes/obituary.aspx?pid=167310964).[4]  Although Feitell apparently was not asked to tell his side of the story prior to his death, there appears to be little doubt that he and Shenghur were sometimes at odds.  (See, e.g., H. 3 (Feitell's statement that Shenghur had been "on me from the beginning in a nice way for me to understand that he wants –

---

[4]     Rule 201(b)(2) of the Federal Rules of Evidence permits a court to take judicial notice of facts whose accuracy cannot reasonably be questioned.  Mr. Feitell's death appears to be such a fact.

he expects the court to hear his story in full"); S. 5-6 (Feitell's statement that "[t]he defendant and I have been at loggerheads in this case since the return of the verdict and before, primarily . . . because [he] . . . could not come to grips with the intricacies of the case or a recognition of what actually happened in this case."); id. at 6 (Your Honor's observation that Feitell was faced with "a very difficult client and a very difficult situation," and had "more than fulfilled [the duty] to be zealous on [Shenghur's] behalf," but that Shenghur "foolish[ly] . . . [did] not heed the good advice of his counsel")).

"Although the Sixth Amendment provides a criminal defendant the right to the assistance of counsel, this right 'does not guarantee a meaningful relationship between the defendant and his counsel.'" Haith v. Walsh, No. 08 Civ. 6753 (NRB), 2009 WL 2433747, at *5 (S.D.N.Y. July 30, 2009) (quoting United States v. John Doe # 1, 272 F.3d 116, 122 (2d Cir. 2001)) (internal citation and certain quotation marks omitted). Here, notwithstanding Shenghur's complaints, his relationship with Feitell was not so fraught as to give rise to a constitutional violation.

Although Shenghur complains in some detail about his relationship with Feitell, (Pet. at 16-19; Supp. Pet. at 1-2; Shenghur Aff. ¶¶ 5-7), he has failed to show that there is anything another assigned attorney might have done that could have changed the outcome of this case.  Indeed, any attorney confronted with the overwhelming proof of Shenghur's guilt presumably would have urged forcefully that he plead guilty.  In that connection, counsel perhaps might have sought to convince the prosecutor to accept a plea to a conspiracy charge involving a smaller quantity of drugs, especially in light of

17

Shenghur's age.  Tellingly, however, Shenghur does not suggest that Feitell failed to pursue this alternative on his behalf.  Nor does Shenghur suggest that another attorney might have been able to convince him to plead guilty.

Accordingly, the mere fact that Feitell and Shenghur may not have gotten along does not suggest that he suffered any prejudice that entitles him to a new trial.

His remaining assignments of error similarly do not withstand scrutiny.

2.     Failure to Permit Shenghur to Testify

Moving beyond the tenor of his relationship with counsel, Shenghur first contends that Feitell's representation was constitutionally ineffective because he "thwarted [Shenghur] from exercising his right to testify" at the competency hearing, failed to inform Shenghur of his right to testify on his own behalf, and "should have advised [Shenghur] that he would not stand in his way if he decided to testify."  (Reply at 3; Pet. at 18; Supp. Pet. at 2).

a.     Pretrial Hearing

Under the Sixth Amendment, criminal defendants are entitled to the effective assistance of counsel at pretrial hearings, just as they are at trial.  See, e.g., Hawthorne v. Schneiderman, 695 F.3d 192, 195, 197 n.9 (2d Cir. 2012) (applying Strickland analysis to claim of ineffective assistance at suppression hearing); Choullam v. United States, Nos. 05 Cr. 523, 10 Civ. 5257 (LTS), 2011 WL 3962601, at *2 (S.D.N.Y. Sept. 6, 2011) (same).  Nevertheless, the Supreme Court has never expressly held that a criminal defendant has an absolute right to testify at a pretrial hearing.  Hawthorne, 695

18

F.3d at 197 n.10.  It consequently is by no means clear that Shenghur could prevail on this aspect of his ineffectiveness claim even if he were able to show that he wished to testify at the competency hearing and that Feitell prohibited him from doing so.

In any event, even if such an outright impediment to a defendant's testimony at a pretrial hearing could constitute a Sixth Amendment violation, Shenghur's attempt to rely on that here would fail for at least two reasons.  First, the record clearly establishes that Shenghur could have testified at the hearing, but ultimately heeded Feitell's advice not to do so because "the hearing [was] on competency and had . . . very little to do with the trial."  (H. 3).  Moreover, no matter what advice Feitell may have given (or not given) Shenghur with respect to the hearing, Your Honor expressly advised Shenghur that he could testify if he so wished, stating:

> I'll be happy to give you that opportunity.  That opportunity is not yet, but you will have that opportunity before this hearing is over, after consultation with your lawyer.  So we'll save this for later if you wish to testify.

(Id. at 207).  Your Honor also raised the issue again at the close of the two experts' testimony.  At that time, Your Honor suggested that Feitell discuss with Shenghur whether or not he would testify.[5]  Eventually, Feitell informed the Court that, based on his advice, Shenghur had decided not to testify.  At that time, Shenghur raised no objection to Feitell's representation to the Court.  (Id. at 430).  Since Shenghur was hardly a shrinking

---

[5]     See id. at 390 ("[T]he only other witness that you've indicated would be a possibility is the defendant himself, and I think . . . your own personal opinion was that he should not testify, but that's, of course, his decision in the end.  So . . . you may want to discuss that with him.").

violet on other occasions, (see, e.g., H. 169-70, 174-46, 207; T. 9-12; S. 10), his silence strongly suggests that there is no factual basis for his present claim that he wished to testify at the competency hearing, but was denied that right.

Second, even if Shenghur had a Sixth Amendment right to testify at the hearing, and Feitell abridged that right by refusing to let him do so, Your Honor concluded that the recordings of Shenghur's telephone conversations at the MCC alone constituted "irrefutable evidence" of Shenghur's competency. (Competency Dec. at 9). As Your Honor explained, "no objective listener could listen to those tapes and not conclude that [Shenghur] was sane, rational, intelligent, fully understanding of his rights, fully able to assist in his defense, and, in a word, competent." (Id.). The decision also noted that Your Honor "had a full opportunity to observe . . . Shenghur during the five-day competency hearing and saw repeated evidence of malingering." (Id. at 10). For example, although Shenghur engaged in various actions during the hearing in an effort to show that he was incompetent,

> none of this behavior prevented him from having seemingly normal conversations with his defense counsel, as was made manifest . . . during the Government's cross-examination of Dr. Janoson, when . . . Shenghur interjected to ask if his attorney could show the Court some materials that the defendant had previously shown to his counsel.

(Id. (citing H. 207)).

In sum, as the recordings of his conversations irrefutably showed, and as Your Honor found, Shenghur was competent to stand trial.  Any testimony that he might have given therefore could not have led to a contrary finding.

        b.    <u>Trial</u>

Shenghur also alleges that Feitell abridged his right to testify on his own behalf at trial.  (<u>See</u> Supp. Pet. at 2).  Whatever the state of the law may be with respect to pretrial hearings, there is no doubt that a criminal defendant has an absolute right to testify in his own defense during a trial.  <u>See</u> <u>Rock v. Arkansas</u>, 483 U.S. 44, 49-51 (1987).  For that reason,

> [a]lthough counsel should always advise the defendant about the benefits and hazards of testifying and of not testifying, and may strongly advise the course that counsel thinks best, counsel must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant, and counsel must abide by the defendant's decision on this matter.

<u>Brown v. Artuz</u>, 124 F.3d 73, 79 (2d Cir. 1997).  Accordingly, if Feitell failed to advise Shenghur about his right to testify at trial, or restricted his ability to do so, his conduct clearly would have departed from an objective standard of reasonableness.

Here again, there is substantial reason to question the veracity of Shenghur's statements regarding Feitell's advice to him, especially since Your Honor clearly told Shenghur he had the right to testify at trial on his own behalf, after Feitell represented that he had "declined to testify."  (T. 428).  At that time, Shenghur confirmed that he did not wish to testify:

| | |
|---|---|
| THE COURT: | Mr. Shenghur, in light of the background of this, I need to make sure you agree with your counsel.  Do you agree with your counsel? |
| [SHENGHUR]: | What does it mean? |
| THE COURT: | Do you want to testify or not? |
| [SHENGHUR]: | What should I testify? |
| THE COURT: | No, Mr. Shenghur, please don't play these games that you have periodically played with the Court.  It's a simple question, do you wish to testify or not? |
| [SHENGHUR]: | No. |

(Id.).

Furthermore, even if this Court were to assume that Shenghur was unaware of his right to testify at trial, or was denied that right by his counsel, he still would have to satisfy the prejudice prong of Strickland to secure a new trial.  466 U.S. at 694.  On the facts of this case, that simply is not possible.

At the outset, there can be no doubt that Shenghur worked with others to negotiate a heroin deal.  Indeed, the proof at trial included recordings and translations of Shenghur's telephone conversations with Nasraty and the meeting at Starbucks where he delivered the heroin sample to Nasraty.  Nor can there be any claim of misidentification since Shenghur was identified by both Nasraty and the agents who surveilled the Starbucks meeting, and he had the promised heroin in his hotel room.  Finally, it is clear that Shenghur and his co-conspirators had the ability to deliver a large quantity of heroin,

as alleged in the indictment, since there was approximately 1.4 kilos of heroin in his possession at the time of his arrest.

In these circumstances, as Your Honor accurately indicated during Shenghur's sentencing, "the evidence in this case was overwhelming and . . . beyond any uncertainty." (S. 13) (emphasis added). It follows that even if Shenghur had taken the stand to explain that there were errors in the interpretation of his post-arrest statements, as he later claimed at sentencing, (id.), he would have been forced to admit that he was the person who furnished Nasraty with a heroin sample, and that he also knowingly had possessed more than one kilo of heroin in his hotel room. In light of these incontrovertible facts, Shenghur cannot show, as he must, that there is a "reasonable probability" that his testimony would have led to his acquittal or a reduced sentence.

### 3.   Remaining Assignments of Error

In his motion papers, Shenghur also takes several potshots at other aspects of Feitell's conduct of the trial. First, Shenghur contends that Feitell committed errors of constitutional dimension during his opening statement because he referenced the potential punishment Shenghur faced if convicted and made comments that "effectively diminished the [Government's] burden of proof." (Pet. at 19). Second, Shenghur alleges that Feitell's cross-examination of several Government witnesses evidenced his ineffectiveness. (Id. at 20-22). Finally, Shenghur maintains that Feitell's numerous alleged errors must be considered in the "aggregate" because the Supreme Court has

23

directed courts to "look at the 'totality of the evidence before the judge or jury.'" (Reply at 6); see Lindstadt, 239 F.3d at 199 (quoting Strickland, 466 U.S. at 695-96)).

These additional assignments of error need not be addressed in any detail. As noted previously, even if Shenghur were able to establish that Feitell's representation of him was grossly ineffective, he still would have to satisfy the prejudice prong of Strickland to prevail. Given the "overwhelming" proof of his guilt, Shenghur cannot possibly do so here. Simply put, even a latter-day Clarence Darrow could not have secured an acquittal on the facts of this case. Shenghur therefore is not entitled to set aside his conviction on ineffectiveness grounds, no matter how poor Feitell's representation may have been.

IV.    Conclusion

For the foregoing reasons, the Court should deny Shenghur's Petition. Additionally, the Court should decline to issue Shenghur a certificate of appealability because Shenghur has failed to make the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2).

V.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties are hereby directed that if they have any objections to this Report and Recommendation, they must, within fourteen days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Jed S. Rakoff, United States District Judge, and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, NY 10007,

and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).

Any requests for an extension of time for filing objections must be directed to Judge

Rakoff.  Any failure to file timely objections will result in a waiver of those objections for

purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 6(a), 6(e), 72(b).

Dated:      New York, New York
            August 28, 2015

_____
            FRANK MAAS
      United States Magistrate Judge


Copies to:

Sayed Noor Ali Shah Shenghur
Reg. No. 65064-053
Federal Prison Camp
3705 W. Farm Rd.
Lompoc, CA 93436


All counsel via ECF